# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JUAN A. SANTA CRUZ BACARDI, et al.<br><br>**Plaintiffs**<br><br>vs.<br><br>METRO PAVIA HOSPITAL, INC, et al.<br><br>**Defendants** | CIVIL NO. 16-2455(RAM) |

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, District Judge

Pending before the Court are Defendant Máximo Blondet-Passalacqua's *Motion for Summary Judgment* ("Summary Judgment") (Docket No. 121), *Statement of Uncontested Facts in Support of Request for Summary Judgment* ("SUF") (Docket No. 122) and a *Memorandum of Law* (Docket No. 123).

Having considered the parties' submissions in response and in opposition to summary judgment, the Court **GRANTS** Defendant's *Motion for Summary Judgment* for the reasons set forth below.

### I. FACTUAL BACKGROUND

On August 7, 2016, plaintiffs Mr. Juan A. Santa Cruz-Bacardí and Mrs. Mireya Santa Cruz-Bacardí ("Plaintiffs") sued Dr. Gaspar Fuentes Mejía and Metro Pavía Hospital, Inc. d/b/a/ Hospital Pavia Santurce ("Hospital Pavia") for alleged medical malpractice

resulting in Mr. Juan Santa Cruz-Sigarreta's ("Santa Cruz-Sigarreta") death. (Docket No. 1 at 5-6). Dr. Blondet was included as a Defendant in the *Second Amended Complaint* filed on August 11, 2017 (Docket No. 27). On November 4, 2017, Dr. Blondet filed an *Answer to Second Amended Complaint* denying all allegations against him. (Docket No. 40).[1] Subsequently, on December 10, 2018, he filed a *Motion in Limine* requesting that the expert report of Dr. Ian Cummings be excluded and that the *Second Amended Complaint* be dismissed. (Docket No. 64).

On July 26, 2019, the Court granted in part and denied in part the *Motion in Limine*. (Docket No. 103). The Court struck Dr. Ian Cummings' expert report because it failed to show a national standard of care and failed to comply with Fed. R. Evid. 702 and Rule Fed. R. Civ. P. 26. Id. at 14. The claims against Dr. Blondet were not dismissed at that time because a motion *in limine* is not tantamount to a motion for summary judgment. Id. at 15.

On September 17, 2019, the Court denied Plaintiffs' *Motion for Reconsideration*. (Docket Nos. 104 and 118). The Court also denied Dr. Blondet's *Motion Adopting Expert* filed at Docket No.

---

[1] Dr. Blondet is the sole remaining Defendant in the case at bar. Defendant Metro Santurce, Inc. d/b/a/ Hospital Pavía Santurce was dismissed pursuant to a voluntary dismissal filed by Plaintiffs at Docket No. 52 and subsequently granted at Docket No. 53. Defendants Dr. Gaspar Fuentes Mejía and Emergency Medical Service, Inc. were dismissed from the case pursuant to a voluntary dismissal filed by Plaintiffs at Docket No. 112 and granted at Docket No. 114.

95. (Docket No. 120). On October 7, 2019, Dr. Blondet moved for summary judgment (Docket Nos. 121, 122 and 123).

## II. LEGAL STANDARD

A motion for summary judgment is governed by Fed. R. Civ. P. 56(a). This rule entitles a party to judgment if "the movant shows [...] no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Mercado-Reyes v. City of Angels, Inc., 320 F. Supp. 3d 344, 347 (D.P.R. 2018) (quotation omitted). A fact is material if it may determine the outcome of the litigation. See Id.

The moving party, here Dr. Blondet, has "the initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact' with definite and competent evidence." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Once this occurs, the burden shifts to the nonmovant, here Plaintiffs. The First Circuit has stated that a non-moving party must "with respect to each issue on which he has the burden of proof, [...] demonstrate that a trier of fact reasonably could find in his favor." Woodward v. Emulex Corp., 714 F.3d 632, 637 (1st Cir. 2013) (quotation omitted).

While a Court will draw all reasonable inferences in favor of the non-movant, it will disregard unsupported or conclusory allegations. See Johnson v. Duxbury, Massachusetts, 2019 WL

3406537, at *2 (1st Cir. 2019). Moreover, the existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Scott v. Harris, 550 U.S. 372, 379 (2007) (quotation omitted). Hence, a court should review the record in its entirety and refrain from credibility determinations or weighing of the evidence. *See* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000).

Finally, Local Rule 56 also governs summary judgment. *See* D.P.R. Civ. R. 56. Per this Rule, a motion for summary judgment must include "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which […] there is no genuine issue of material fact to be tried." Id. A nonmoving party must then "admit, deny or qualify the facts supporting the motion […] by reference to each numbered paragraph of the moving party's statement of material facts." Id. The First Circuit has highlighted that "[p]roperly supported facts […] shall be deemed admitted unless controverted in the manner prescribed by the local rule." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 520 (1st Cir. 2015) (quotation omitted).

### III. FINDINGS OF FACT

Before discussing the undisputed facts, the Court addresses several compliance issues regarding Plaintiffs' *Response* to Dr. Blondet's SUF (Docket No. 127). In general, Plaintiffs admitted, denied or qualified the proposed facts. However, while they

qualified their response to Defendant's Facts Nos. 8 and 10 (Docket No. 127 at 3 ¶¶ 8 and 10), they failed to include a record citation alongside their response, as required by Local Rule 56. *See* D.P.R. Civ. R. 56 ("Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule.") Hence, these facts are deemed admitted as per Local Rule 56(e) and Fed. R. Civ. P. 56(e), the latter of which states that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact […], the court may […] consider the fact undisputed."

The First Circuit contends that a "nonmovant can thwart the motion [for summary judgment] **only** by showing through materials of evidentiary quality that a genuine dispute exists about some material fact." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 8 (1st Cir. 2004). Therefore, without evidentiary proof and a record citation showing that the facts in question are, for example, irrelevant or self-serving, the factual disputes alone are not enough to surpass a summary judgment motion. *See e.g.*, Baum-Holland v. El Conquistador P'ship, L.P., S.E., 336 F. Supp. 3d 6, 20 (D.P.R. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.242, 247-248 (1986)) (Finding that the existence "of some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment."). Here, Defendant admitted, denied or qualified most of the facts in

Plaintiffs' *Statement of Additional Material Facts* ("SAMF"). (Docket No. 127). Yet, he sometimes failed to include a record citation in his response or only responded that the fact was self-serving or irrelevant. These include Facts Nos. 8, 31-33, 35, 37, 45, 56, 59, 62-66. (Docket No. 133 ¶¶ 8, 31-33, 35, 37, 45, 56, 59 and 62-66). Accordingly, these facts are deemed admitted.

A review of most of the denials shows that Defendant failed to oppose the truth of the fact itself. For example, Plaintiffs' SAMF Facts Nos. 12-18 revolve around an April 29th, 2015 emergency room visit by Mr. Santa Cruz-Sigarreta wherein Dr. Blondet allegedly visited him and annotated his hospital record. (Docket No. 127 at 6-7 ¶¶ 12-18). Yet, Dr. Blondet's responses to the facts merely state "Irrelevant in the amended complaint filed there are no allegations regarding April 29, 2015 (Exhibit 3 Second Amended Complaint)." (Docket No. 133 at 5-8 ¶¶ 12-18). While this may be true, Dr. Blondet's responses fail to contradict the proposed facts. Thus, Facts Nos. 12-18 of the SAMF are admitted. *See* Marina de Ponce, Inc. v. Fed. Deposit Ins. Corp., 2018 WL 1061441, at *2 (D.P.R. 2018) ("The denials presented by Plaintiff Marina do not **oppose the truth of the statement offered and are either irrelevant to the matter at hand, provide additional evidence not related to the fact in question and/or failed to contradict it**.") This also applies to Defendant's responses to Facts Nos. 6, 10-11, 24, 28, 42, 49, 52-53, 55, 58 and 60-61 (Docket Nos. 133 ¶¶ 6, 10-11, 24,

28, 42, 49, 52-53, 55, 58 and 60-61). Hence, these facts are admitted as well.

After analyzing the proposed facts as stated in Defendant's SUF and/or in Plaintiffs' SAMF, and **only crediting the material facts properly supported by a record citation** in accordance with Local Rule 56, the Court makes the following findings of facts:[2]

1. Dr. Blondet is a pulmonologist. (Docket No. 122 ¶1).

2. Mr. Santa Cruz-Sigarreta was a seventy (70) year-old patient, who suffered from angina pectoris, hypertension, hyperlipidemia, diabetes mellitus, coronary artery disease ("CAD"), and Idiopathic Pulmonary Fibrosis ("IPF"). (Docket No. 127 ¶1).

3. Mr. Santa Cruz-Sigarreta was a private patient of Dr. Blondet, who treated him for IPF, a chronic pulmonary condition, since 2012. (Id. ¶2).

4. Mr. Santa Cruz-Sigarreta was diagnosed with IPF in 2012. (Id. ¶3).

5. Mr. Santa Cruz-Sigarreta visited the offices of Dr. Blondet approximately every six (6) weeks. (Id. ¶4).

6. Dr. Blondet saw Mr. Santa Cruz-Sigarreta twenty-four (24) times in 148 weeks. (Id. ¶5).

7. During that period, Dr. Blondet provided ongoing care to Mr. Santa Cruz-Sigarreta for episodic illness related to IPF. (Id. ¶6).

8. During the three (3) years that Mr. Santa Cruz-Sigarreta was treated by Dr. Blondet, the patient only suffered three (3) or four (4) exacerbations of his IPF symptoms. (Id. ¶9).

9. When Mr. Santa Cruz-Sigarreta suffered exacerbations of his IPF symptoms, Dr. Blondet "would see him (Mr. Santa Cruz)

---

[2] The numbers for the admitted facts do not necessarily coincide with their respective numbers in the SUF or in the SAMF. Therefore, the Court also includes a reference to their original paragraph number.

   and would give some steroids and some antibiotics and he
   would get better". (Id. ¶10).

10. Dr. Blondet has been an on-call pulmonologist available for
    consultations at Hospital Pavía since 2001. (Id. ¶7).

11. Mr. Santa Cruz-Sigarreta's IPF progressed very slowly during
    the three (3) years he was treated by Dr. Blondet. (Id. ¶11).

12. On July 24, 2015, Mr. Santa Cruz-Sigarreta and his wife, Mrs.
    Mireya Bacardí-González (hereinafter, "Mrs. Bacardí"),
    called Dr. Blondet's private offices at Instituto Neumológico
    de Puerto Rico ("Instituto") to seek immediate help and
    advice due to Mr. Santa Cruz-Sigarreta's worsening
    respiratory problems, severe coughing episodes and copious
    production of phlegm. (Id. ¶28).

13. On July 24, 2015, given that Dr. Blondet was not at his
    office, the person that took their call at Instituto
    instructed them to go to Hospital Pavía's Emergency Room
    ("ER"), so that Dr. Blondet could see Mr. Santa Cruz-
    Sigarreta, since he was there seeing patients. (Id. ¶30).

14. The person that took their call and referred them to Hospital
    Pavía's ER also told them to request Dr. Blondet once they
    got there. Once at the ER, Mrs. Bacardí requested from the
    triage nurse to please call Dr. Blondet. (Id. ¶31).

15. According to the office manager and the receptionist at
    Instituto, when a patient called requesting the services of
    a physician who was not available, and the patient was
    referred to Hospital Pavía's ER due to an emergency
    situation, the standard operating procedure in place
    throughout 2015 was to call the patient's physician at his
    cellular phone to let him know of the emergency situation.
    (Id. ¶32).

16. According to the office manager and the receptionist at
    Instituto, in the scenario presented in the previous
    paragraph, Instituto's office personnel would also write down
    on a piece of paper the patient's name and symptoms, and
    leave that message at the corresponding physician's desk.
    (Id. at 11 ¶33).

17. On July 24, 2015 Mr. Santa Cruz-Sigarreta and his wife, Mrs.
    Bacardí, arrived at Hospital Pavía's ER. (Id. ¶34).

18. After Mr. Santa Cruz-Sigarreta was admitted to the ER, Mrs. Bacardí was informed that calls were placed to Dr. Blondet, and that they had left him a message. Throughout the time they spent at the ER, Mrs. Bacardí was not informed whether Dr. Blondet was reached and told to come see her husband, which was why they had gone to the ER. (Id. ¶35).

19. Phone records produced by AT&T show multiple calls to Dr. Blondet's cellular telephone number from the telephone number used at the ER to contact physicians. (Id. at 12 ¶37).

20. On the afternoon of July 24, 2015, Dr. Blondet was one of two (2) on-call pulmonologists available to see patients at Hospital Pavia. (Id. ¶38).

21. Dr. Blondet was on-call and present at Hospital Pavia until 5:00 pm on July 24, 2015. (Id. ¶39).

22. Since Mr. Santa Cruz-Sigarreta's initial oxygen saturation at Hospital Pavia's ER was 77%, he was admitted to the emergency room for evaluation and treatment under the services of Dr. Gaspar Fuentes-Mejía ("Dr. Fuentes"), who ordered several diagnostic tests (CBC, CMP BNP, ABG, Chest X-ray, and electrocardiogram). (Id. ¶41).

23. Mrs. Bacardí informed Dr. Fuentes that Mr. Santa Cruz-Sigarreta was Dr. Blondet's patient and that they had gone to the hospital to see him. (Id. ¶42).

24. After Dr. Fuentes was informed of the ABG values, he consulted with Dr. Blondet over telephone concerning the respiratory condition presented by Mr. Santa Cruz-Sigarreta. (Id. ¶44).[3]

25. According to Dr. Fuentes, "on several occasions … regardless of whether it be the pulmonologist or the cardiologist", he "received patients who are patients of the sub-specialists", and he "called that sub-specialist regarding a case [he] had to deal with regarding those patients." (Id. ¶45).

26. According to the phone records, Dr. Blondet's conversation with Dr. Fuentes on July 24, 2015, apparently occurred at

---

[3] Regarding ABG values, the Cleveland Clinic defines an Arterial Blood Gas Test as "[a] blood test that measures oxygen and carbon dioxide in the blood." Heart & Vascular Dictionary, Cleveland Clinic, https://my.clevelandclinic.org/departments/heart/patient-education/dictionary (last visited Jan. 15, 2020).

   4:25 pm and lasted seventy-eight (78) seconds, which is one minute and eighteen seconds (1:18). (Id. ¶48).

27. Dr. Blondet indicated to Dr. Fuentes that the ABG values were normal for Mr. Santa Cruz-Sigarreta due to his pulmonary condition and that if the labs turned out well, Dr. Fuentes should discharge the patient. (Id. ¶49).

28. When Dr. Fuentes spoke with Dr. Blondet, all laboratory results were still pending, including the BNP, which later resulted in a "panic value". (Id. ¶50).[4]

29. Dr. Blondet did not personally evaluate Mr. Santa Cruz-Sigarreta on July 24, 2015 after Dr. Fuentes consulted with him over the phone concerning the respiratory condition presented by the patient. (Id. ¶51).

30. Instituto's guidelines require that consultations from a physician to an Instituto physician must be personally evaluated as soon as possible. (Id. ¶52).

31. According to Dr. Blondet, the reason he did not go to see Mr. Santa Cruz-Sigarreta at Hospital Pavía's ER on July 24, 2015 was because he allegedly did not receive a consultation. (Id. ¶53).

32. Dr. Blondet's proffered expert could not answer if it was prudent for Dr. Blondet not to see his patient on July 24, 2015 at Hospital Pavía's ER. (Id. ¶55).

33. After being discharged from the ER, Mr. Santa Cruz-Sigarreta remained in bed at home, with worsening shortness of breath, continued coughing with phlegm, dizziness, and a feeling of "pressure" in his chest. (Id. ¶56).

34. On July 27, 2015, Mr. Santa Cruz-Sigarreta became increasingly ill and was taken by ambulance to Hospital HIMA San Pablo Fajardo ("Hospital HIMA"). (Id. ¶57).

---

[4] Regarding BNP, Cleveland Clinic defines BNP, or B-type natriuretic peptide, as a hormone "produced by your heart […] released in response to changes in pressure inside the heart. […] Levels go[] up when heart failure develops or gets worse, and […] down when heart failure is stable." NT-proB-type Natriuretic Peptide (BNP), Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/16814-nt-prob-type-natriuretic-peptide-bnp (last visited Jan. 15, 2020). In particular, BNP is "measured as a simple blood test to help diagnose and monitor heart failure." Id.

35. Mr. Santa Cruz-Sigarreta was admitted to Hospital HIMA at 4:43 pm with a principal diagnosis of pneumonia and acute myocardial infarction. (Id. ¶58).

36. While Mr. Santa Cruz-Sigarreta was admitted at Hospital HIMA's Intensive Care Unit ("ICU"), Mrs. Bacardí called Dr. Blondet's office, was not able to reach him, and left a message with a secretary or receptionist. (Id. ¶59).

37. Dr. Blondet called Mrs. Bacardí back. Dr. Blondet responded that he was not aware of the situation with Mr. Santa Cruz-Sigarreta. (Id. ¶60).

38. During that telephone conversation, Mrs. Bacardí informed Dr. Blondet that Mrs. Santa Cruz-Sigarreta was at HIMA's ICU, that he had had a heart attack, that he was very ill, and relayed the information that the treating physicians at HIMA had provided to her. (Id. ¶61).

39. After that conversation with Dr. Blondet, Mrs. Bacardi never heard from Dr. Blondet again, who never called or visited to see how his patient was doing. (Id. ¶62).

40. On August 6, 2015, the patient was transferred by air ambulance from Hospital HIMA to Centro Cardiovascular de Puerto Rico y del Caribe. (Id. ¶63).

41. Mr. Santa Cruz-Sigarreta died on August 14, 2015 at Centro Cardiovascular de Puerto Rico y del Caribe. (Id. ¶64).

**IV. ANALYSIS**

Dr. Blondet's request for summary judgment rests on Puerto Rico Supreme Court case law which holds that expert testimony is required to prove both a standard of care and causation in medical malpractice suits. (Docket No. 123 at 12). He posits that since this Court struck Plaintiff's sole expert report, the claims against him cannot survive. As discussed below, this Court agrees with Dr. Blondet.

In diversity cases such as this one, the substantive law of Puerto Rico is controlling. *See* Rivera-Marrero v. Presbyterian Cmty. Hosp., Inc., 2016 WL 7670044, at *1 (D.P.R. 2016) (quoting Summers v. Fin. Freedom Acquisition LLC, 807 F.3d 351, 354 (1st Cir. 2015))("Since this is a diversity case, we look to federal law for guidance on procedural matters (such as the summary judgment framework) and to state law (here, [Puerto Rico] law) for the substantive rules of decision."). Thus, in medical malpractice cases in Puerto Rico, a plaintiff must assert three main elements: "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances); (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." Laureano Quinones v. Nadal Carrion, 2018 WL 4057264, at *2–3 (D.P.R. 2018) (quoting Marcano Rivera v. Turabo Medical Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005)). The standard of care is based on a national standard. *See* Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico, 394 F.3d 40, 43 (1st Cir. 2005). Further, there is a presumption that "physicians have 'provided an appropriate level of care.'" Laboy-Irizarry v. Hosp. Comunitario Buen Samaritano, Inc., 2019 WL 3311270, at *9 (D.P.R. 2019) (quoting Borges ex rel. S.M.B.W. v. Serrano-Insern, 605 F.3d 1, 7 (1st Cir. 2010)). Plaintiffs must refute this presumption by "adducing evidence sufficient to show both the minimum standard of

care required and the physician's failure to achieve it." Id. Under Puerto Rico law, causation is judged by the doctrine of "adequate causation." An adequate cause "is not every condition without which a result would not have been produced, but that which ordinarily produces it according to general experience." Laboy-Irizarry v. Hosp. Comunitario Buen Samaritano, Inc., 2019 WL 3311270, at *9 (D.P.R. 2019) (quoting Cardenas Maxan v. Rodriguez Rodriguez, 125 P.R. Dec. 702, 710 (1990), P.R. Offic. Trans.); see also, Ganapolsky v. Boston Mut. Life Inc. Co., 138 F.3d 446, 443 (1st Cir. 1998) ("A condition is an adequate cause if it ordinarily can be expected to produce the result at issue.")

Puerto Rico Supreme Court precedent and the First Circuit have repeatedly held that expert testimony is required to prove causation in medical malpractice suits and to refute the above-mentioned presumption. For example, in Marcano Rivera v. Turabo Medical Center Partnership, the First Circuit averred that **"a factfinder normally cannot find causation [a breach of the duty owed] without the assistance of expert testimony to clarify complex medical and scientific issues that are more prevalent in medical malpractice cases than in standard negligence cases."** Marcano Rivera v. Turabo Medical Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005)) (quoting Rojas-Ithier, 394 F.3d at 43); see also Cruz-Vazquez v. Mennonite General Hosp., Inc., 613 F.3d 54, 56 (1st Cir. 2010); Pages- Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 113

(1st Cir. 2010); Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 191 (1st Cir. 1997) ("A medical malpractice plaintiff can—and often does—establish causation through expert testimony.") In the same vein, this District has held that expert testimony is necessary to prove both the applicable standard of care **and** a doctor's failure to meet it. *See* Vargas-Alicea v. Cont'l Cas. Co., 2019 WL 1453070, at *1 (D.P.R. 2019) (citing Rolón-Alvarado v. San Juan, 1 F.3d 74, 78 (1st Cir. 1993)) ("Given that medical knowledge is critical to demonstrating the parameters of a health-care provider's duty, the minimum standard of acceptable care is almost always a matter of informed opinion."). *See also*, Alers v. Barcelo, 2016 WL 4148237, at *3 (D.P.R. 2016).

This Court struck Plaintiffs' sole expert's report because it failed to articulate a national standard of care, an essential element needed to prove negligence in medical malpractice suits. (Docket No. 103). Moreover, this Court denied Plaintiffs' *Motion for Reconsideration* on this same issue. (Docket No. 118). Another Judge in this District in a similar case granted summary judgment after determining that preclusion of expert testimony made it difficult for a party to establish a Defendant's duty of care or a breach of said duty necessary to prove causation. In Gonzalez Rivera v. Hosp. HIMA-Caguas, this District noted:

> Without the expert testimony of Dr. Lasalle and Dr. Hausknecht, Plaintiff is **unable to present any expert opinion sufficient to establish either the Defendants'**

>      **duty of care or a breach of the duty owed. The expert testimony of Dr. Hausknecht is essential to Plaintiff's case.** The preclusion of Dr. Hausknecht "although technically not a dismissal of [Plaintiff's] case, [would] effectively amounted to one."

Gonzalez Rivera v. Hosp. HIMA-Caguas, 2018 WL 4676925, at *5 (D.P.R. 2018), aff'd sub nom. Gonzalez-Rivera v. Centro Medico Del Turabo, Inc., 931 F.3d 23 (1st Cir. 2019) (internal citations omitted) (quoting Esposito v. Home Depot, U.S.A., Inc., 590 F.3d 72, 78 (1st Cir. 2009)). Thus, this Court believes that as in Gonzalez-Rivera, summary judgment is proper here because without expert testimony, Plaintiffs cannot establish Dr. Blondet's breach of a duty of care. Without establishing this breach, Plaintiffs also cannot establish sufficient causation to link Dr. Blondet's alleged actions or omissions with Mr. Santa Cruz-Sigarreta's death. Plaintiffs failed to proffer to the Court sufficient material facts which show that Dr. Blondet's actions contributed to Mr. Santa Cruz-Sigarreta's death **three weeks** after Dr. Blondet allegedly failed to visit him. Therefore, Plaintiffs are missing all three elements required to prevail in a medical malpractice case as without expert testimony they cannot show: (1) the duty that Dr. Blondet owed to the deceased; (2) an act or omission on his part breaching that duty; and (3) a sufficient causal nexus between the breach and the patient's death. *See* Rolón-Alvarado v. San Juan, 1 F.3d 74, 77 (1st Cir. 1993).

The Court notes that very narrow exceptions exist where a Court may find that expert testimony is not necessary to prove causation in medical malpractice suits. These include "situations where common knowledge and experience are all that is necessary to comprehend a defendant's negligence […], or where negligence is grossly apparent, […] or where a doctor's conduct violates a set standard." Rolón-Alvarado, 1 F.3d at 79. This means that the exceptions must encompass "only those few situations in which the claimed medical malpractice **is sufficiently blatant or patent that lay persons, relying on common knowledge and experience, can legitimately recognize or infer negligence**." Id. However, none of these exceptions are applicable to the present case. A review of the Docket shows that Plaintiffs fail to show that Dr. Blondet's conduct was "sufficiently blatant or patent that [a] lay person[]" could infer that his negligence caused Mr. Santa Cruz-Sigarreta's death. Id.

The First Circuit's ruling in Rodriguez-Diaz v. Seguros Triple-S, Inc. regarding the exclusion of expert testimony and exceptions to the rule is instructive. *See* Rodriguez-Diaz v. Seguros Triple-S, Inc., 636 F.3d 20, 24 (1st Cir. 2011). In Rodriguez-Diaz, the First Circuit upheld a district court's granting of summary judgment in defendant's favor because expert medical testimony was required to prove a physician's negligence and the lower court had already excluded the expert's report.

Moreover, plaintiffs had not presented any evidence apart from the expert testimony which could "establish that the care afforded did not meet minimal standards". Id. at 23. The Rodriguez-Diaz Court held that:

> Absent an expert witness, […] it would be hard for the jury to know anything about relative urgency or any need for differentiation on some other basis—let alone how the patient's specific symptoms or the slide results in this case might bear upon the question. […] [T]he appeal fails **because there is a legal rule requiring expert testimony in a case of this character, and possible exceptions [such as the jury using common sense to close the gap] to the rule have not been shown to apply**.

Id. at 24.

Lastly, the opinion in Mercado-Velilla v. Asociacion Hosp. del Maestro also shows a similar scenario wherein the Court determined that the case did not fall within the exceptions exemplified in Rolón-Alvarado. In that case, the Court explained that as "the average layperson does not know how much Prednisone must be consumed for an individual to suffer long-term consequences." Mercado-Velilla v. Asociacion Hosp. del Maestro, 902 F. Supp. 2d 217, 239 (D.P.R. 2012). Thus, to determine if a given medication caused injuries when it was prescribed is the typical 'complex medical and scientific issue[ ] that [is] prevalent in medical malpractice cases'" and which requires expert testimony. Id. (internal quotations omitted).

Here, a similar situation occurs. Plaintiffs simply stating that Dr. Blondet's negligence is "grossly apparent," without more,

is insufficient for the exceptions articulated in Rolón-Alvarado to apply. (Docket No. 126 at 16 ¶45). Just because negligent conduct seems "apparent" does not mean that a layperson can "close the gap" and conclude that Dr. Blondet's purported actions or omissions resulted in the patient's death. *See* Prince v. Hosp. Hima San Pablo Caguas, 2014 WL 2475611, at *6 (D.P.R. 2014) (quoting Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994)) ("To prevail […] "[a] plaintiff must prove, by a preponderance of the evidence, that the physician's negligent conduct was the factor that 'most probably' caused harm to the plaintiff.").

At all relevant times, Mr. Santa Cruz-Sigarreta received medical care from physicians other than Dr. Blondet. Mr. Santa Cruz-Sigarreta during his July 24, 2015 visit to Hospital Pavia's ER was under the care of Dr. Fuentes. (Docket No. 127 ¶41). Moreover, between July 27, 2015 and his passing eighteen (18) days after on August 14, 2005, Mr. Santa Cruz-Sigarreta was under the care of physicians at Hospital HIMA and Centro Cardiovascular de Puerto Rico y del Caribe. Id. ¶¶ 57-64. In light of the intervention of multiple physicians, and Mr. Santa Cruz-Sigarreta's pre-existing cardiac condition, this Court finds that it cannot infer for purposes of summary judgment that Dr. Blondet's purported negligence was an adequate cause of Mr. Santa Cruz-Sigarreta's death. As the First Circuit has cautioned, "an inference is reasonable only if it can be derived from the evidence

without resort to speculation." Hidalgo v. Overseas Ins. Agency, 120 F.3d 328, 332 (1st Cir. 1997).

The Court notes that there are some remaining factual disputes between the parties. However, they are not material in nature and cannot thwart summary judgment. "[T]he requirement is that there be no *genuine* issue of *material* fact." Scott, 550 U.S. at 380 (quoting Anderson, 477 U.S. at 247-48). Here, Plaintiffs failed to create a genuine issue of material fact.

Hence, summary judgment is **GRANTED** dismissing **WITH PREJUDICE** all of Plaintiffs' pending claims including the direct action against insurers under 26 L.P.R.A. §2003.

## V. CONCLUSION

Due to the absence of expert testimony and Plaintiffs' inability to show that Dr. Blondet's conduct was sufficiently blatant or patent that a lay person could infer that he was negligent and caused Mr. Santa Cruz-Sigarreta's death, the Court **GRANTS** Defendants' *Motion for Summary Judgment* (Docket No. 121). Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan Puerto Rico, this 15th day of January 2020.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge